Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2306 | **DATE** | 6/12/2002 |
| **CASE TITLE** | Elaine P. Harris vs. John Ashcroft, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' Motion for Summary Judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUN 1 3 2002 date docketed | 37 |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | S.B docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELAINE P. HARRIS,

    Plaintiff,

v.

JOHN ASHCROFT, Attorney
General of the United States
and DONNIE R. MARSHALL,
Administrator of the Drug
Enforcement Administration,

    Defendants.

Case No. 00 C 2306

Hon. Harry D. Leinenweber

DOCKETED
JUN 1 3 2002

## MEMORANDUM OPINION AND ORDER

Elaine Harris ("Harris"), an African-American, joined the Drug Enforcement Administration (the "DEA") on December 31, 1979, and after completing basic agents' training, became a Criminal Investigator assigned to the Chicago Field Division. Over the next 15 years the DEA repeatedly promoted Harris. In the fall of 1993 Harris was selected to join the Segar Committee, which had been established to monitor the DEA's compliance with a court order issued in a racial discrimination suit filed against the DEA in 1981. In June 1994, she was given the position of Resident Agent in Charge of the DEA's Hammond, Indiana office. This office was her first choice for placement and she was selected by the DEA's Career Board over two white males. In March 1996, she moved with the Hammond Office to Merrillville, Indiana. Her direct supervisor while she was at Hammond was Randy James who was stationed in Chicago. In early 1996, Irvin Lightcap, who was stationed in Indianapolis, became her direct

supervisor. Her supervisors were aware of her membership on the Segar Committee.

In spite of the steady career progression she enjoyed at the DEA, she claims that she has been a victim of a continuing pattern of race and sex discrimination over her entire career at the DEA, and most recently in retaliation for her membership on the Segar Committee. She also contends that as Resident Agent in Charge she did not receive proper support from her supervisors, and from time to time they undermined her authority.

In September 1996, Harris was informed that one of her agents was suicidal and that she was the cause of his grief. She became very upset and asked for some time off. Her supervisor, Lightcap, told her that she could take as much time as she needed. During her leave Lightcap was supportive of her and advanced to her 360 hours of sick leave. She was diagnosed as suffering from major depression. She sought help from the DEA's Employee Assistance Program (the "EAP") which was run by Yvonne Conner ("Conner"), an African-American female. The EAP referred her to a Dr. Levin ("Levin"), a Chicago psychiatrist. Conner informed Dr. Gary Schwartz ("Schwartz"), the DEA Chief Medical Officer, of Harris' condition and gave him her opinion that Harris was not able to perform her duties. Schwartz wrote to Levin requesting a diagnosis, a treatment plan, and a prognosis. Levin responded to Schwartz in December 1996 that Harris was being treated for stress disorder related to her work, was undergoing psychotherapy and pharmacologic treatment, and would be

ready to return to work in January 1997. Schwartz informed the DEA's Health Services Unit, after receiving Levin's report, that before Harris could be cleared to return to work, he needed to know whether she was willing to return to work, whether her decision-making was sound, whether she was capable of carrying and using a firearm in public, and whether she needed any specific accommodations. Her condition also had to be reviewed by an outside contractor because the DEA requires an employee returning from extended medical leave to obtain medical clearance which, in the case of psychiatric leave, requires such a review.

She returned to full duty status on January 13, 1997. While Levin had cleared her to return to work, the Medical Services Unit had not received the information Schwartz had said was needed, so Schwartz issued a memo on January 22, 1997 stating that Harris was not cleared to carry a weapon or participate in aggressive law enforcement. On the following day, January 23, 1997, she was placed on limited duty. Harris' supervisor suggested she work in the Chicago Office until she was cleared for full duty. However, Harris requested and was granted permission to work from her home.

Her return to duty, which she felt was "premature," was not successful and at one point she contemplated suicide. On February 1, 1997, Dr. Levin wrote that, while she could return to active duty, she needed to be accommodated with a temporary reassignment out of the Chicago area. However, because her case had to be reviewed by an independent doctor, Harris was told that no final decision could be

made as to her duty status. She was also advised that, while DEA policy prohibited temporary transfers outside an agent's assigned field division, she could apply for a medical hardship reassignment which allows a transfer to a vacant position. Instead of applying for a medical hardship transfer, however, Harris requested and received, on February 10, 1997, Leave Without Pay status because she had exhausted her sick and annual leave. On March 17, she decided to resign from her position at Merrillville and five days later she submitted a formal request to be placed on emergency medical leave and for 744 hours of leave time from the Department of Justice Voluntary Leave Program. Her application was supported by the opinion of Dr. Levin that she needed at least five to 12 months to deal with her psychiatric problems due to his then diagnosis of post traumatic stress syndrome. As a result she was granted 160 hours from the Leave Bank.

In March 1997, Harris, with Conner's assistance, began to prepare an application for worker's compensation benefits because Harris believed her illness was job-related. On April 1, 1997, Dr. Levin provided a report in support of her application that her Psychiatric problems were, in fact, job related. Harris had completed her application in April although it was not actually filed with the Department of Labor until June or July 1997. The reason for the filing delay is unclear. Under leave bank rules, while a workers' compensation claim is pending all applications for leave are placed on hold. Thus, Harris was denied further leave. About the

same time Harris was told by Conner that she was eligible to apply for disability retirement and Conner helped her prepare her application. Harris signed the application and it was submitted to the Department of Labor. The application was eventually granted and Harris was placed on disability retirement in December 1997.

Harris first sought EEO counseling on April 5, 1997, and filed a formal administrative complaint alleging that the DEA management failed to accommodate her disability and forced her to resign on May 28, 1997. She sought counseling a second time on May 23, 1997, and filed a second administrative complaint on August 22, 1997, based on denial of access to the leave bank. The claims were combined and a final decision denying Harris' claims was issued by the Department of Justice on March 14, 2000. This suit followed.

Harris seeks by this suit to recover for alleged discriminatory actions of the DEA which, she contends, led to her removal as Resident Agent in Charge of the Hammond, Indiana Office. Since many of the acts of which she complains occurred throughout her period of employment with the DEA, the first issue is how far back in time she may go to prove her case. The Attorney General argues that any conduct on the part of the DEA occurring more than 45 days prior to her April 5, 1997 (*i.e.*, prior to February 19, 1997) request for counseling is time barred by DEA regulations. The statute covering federal employees in employment matters, 42 U.S.C. § 2000e-16(c), requires a federal employee to exhaust administrative remedies prior to filing a law suit. DEA employees, as part of the administrative

process, are required by regulation to contact an EEO counselor within 45 days of the alleged discriminatory action. 29 C.F.R. § 1614.105(a)(1).

Harris seeks to avoid the time bar by relying on the so-called "continuing violation" doctrine, so that the actions of the DEA employees occurring from 1994 forward can be considered. She contends that the discriminatory actions of which she complains were taken against her involved the same subject matter, occurred on a day-to-day basis, and none was so permanent that she could foresee that the discriminatory hostility would force her to resign her position with the DEA. The continuous violation doctrine allows a complainant to obtain relief for time-barred acts of discrimination by linking them with acts that fall within the statutory limitations period. *Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 396 (7th Cir. 1999). The courts treat such a series of acts as one continuous act ending within the limitations period. There are three factors the courts consider in making this determination: whether the acts involve the same subject matter; their frequency; and the degree of permanence of the alleged acts of discrimination. *Id.*

The acts upon which Harris relies in support of her continuing violation are set forth in her Local Rule 12N(3)(b) statement, and are supported by her affidavit. These acts include the following: Retha Fulmore, Deputy Assistant Administrator in Charge of Personnel generally showed Harris disrespect as a member of the Segar committee, by, among other things, declining to answer certain of

Harris' questions posed to her at committee hearings; Harris' direct supervisor, Randy James, encouraged her subordinates to resist her authority by communicating directly with them concerning critical operations and policy changes; she was told by James that she shared command with a subordinate which was false; James reprimanded her for reprimanding one of her subordinates; and James encouraged U.S. Attorneys to bypass Harris and go directly to him. She also claims that James' successor, Irvin Lightcap, told her she was a "problem" at a staff meeting, blamed her for a suicidal incident, and on September 1, 1996, told her that one of her subordinates was suicidal. While the court agrees that none of the acts of which she complains are sufficient in and of themselves to constitute actionable conduct so as to start the 45-day counseling requirement, the court also finds that they are insufficient, even when taken together, to constitute actionable conduct. All of her complaints are of a general nature completely lacking specificity as to content, and in most cases lacking a time frame. For example, the alleged reprimand that occurred in 1994 is without any content information whatsoever, leaving the court to wonder what the reprimands concerned and whether they were deserved. The two suicidal incidents are also short of detail except that Harris may have been blamed. There is no evidence that the assignment of blame was racially or sexually motivated or untrue for that matter. The other instances are even more lacking in content. Accordingly, the court finds that the continuing violation doctrine does not help Harris and she must rely

on acts that occurred on or after February 19, 1997 to prove her claim of discrimination. *See, Stern v. Ashcroft*, 284 F.3d 721, 726 (7th Cir. 2002).

Since Harris "retired" from the DEA she must prove constructive discharge. She contends that she was "coerced" into resigning as a result of hostile work environment. To establish a claim for constructive discharge a plaintiff must prove that her working conditions were so intolerable as a result of wrongful discrimination that a reasonable person would be forced into involuntary resignation. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment. *Id.* Harris' position is that she, a black female, was unwanted in a white male culture, even though she was performing in an outstanding fashion. However, the undisputed evidence is that she had fallen into a severe depression, which included suicidal ideation, and was off work for more than three months and was expected to be unable to return to full duty for an extended period of time. Although she, according to her doctor, had made significant progress, and in his view in December 1996 she could return to full duty including weapon possession, nevertheless, a DEA regulation prevents an employee from returning after a psychiatric illness until cleared by an independent doctor. Consequently she was told that she could return prior to clearance but only to limited duty without a weapon. There is no evidence that the DEA regulation in question was

applied in a racially discriminatory way. There is no evidence that the regulation was applied more leniently to similarly situated white males or white females.

The regulation itself is not facially unreasonable, nor unreasonable in its application in this case. It is not unreasonable to obtain second medical opinions particularly concerning psychiatric diagnoses. Even Harris' limited return in January 1997 which was approved by Dr. Levin, proved in her words to be "premature." In fact, Dr. Levin in February 1997, no longer believed she could return to full duty, but could only return if she received a change of scenery as an accommodation and needed approximately five to twelve months to recuperate fully. It is also reasonable to deny a weapon to one who threatened suicide with a weapon such as Harris did in January 1997. While the return-to-work problems Harris encountered were undoubtedly stressful to her and led to her retirement, there is no evidence that any of the problems resulted from racial or sexual animus. The DEA's Employee Assistance Program, to which Harris turned in September 1996 (which as noted was administered by a black female), offered Harris assistance every step of the way. The EAP referred her to Dr. Levin, her psychiatrist; it aided her in obtaining her medical leave; it helped her apply for emergency medical leave; for workers' compensation; and for disability retirement. Her supervisor, Lightcap, offered to allow her to work in Chicago temporarily and furthermore, the Deputy Assistant in charge of Personnel, Fulmore, assisted her in attempting to transfer

to Headquarters in Washington, D.C., although Harris decided to take unpaid leave instead. In any event there is no evidence whatsoever that Dr. Schwartz, the decision-maker in denying her a return to full duty, was acting out of racial or sexual animus. Nor is there any evidence that Conner or Fulmore, African-American females, acted out of racial or sexual animus. Consequently, there is no evidence to support Harris' claim for constructive discharge.

Harris' final claim emanates from the DEA's refusal to allow her to receive benefits from the donated leave program. The reason DEA gave for denial was because Harris had decided to file for workers compensation. The leave program specifically required that an application be held in abeyance while a workers' compensation claim was in process. Harris' theory is that she was denied the benefits because Fulmore had resented the Segar Committee and invented this interpretation to punish Harris. There is no question that at the time Harris was applying for leave from the donated leave program, April 14, 1997, she was in the process of preparing her application for workers compensation. On April 1, 1997, Dr. Levin provided Harris a medical report stating that Harris' psychological problems were job related and hence compensable. Considering the fact that Fulmore was herself an African-American female, it is not patently obvious that she acted with racial and/or sexual animus in denying the benefits of the leave bank program.

Harris points to one other employee who she contends was allowed to obtain leave bank benefits even after filing for workers'

compensation. The exhibit upon which Harris relies however shows that she is mistaken: the employee in question had applied for disability retirement, not workers' compensation. Moreover, the exhibit does not show the race of the employee in question. Thus this does not constitute evidence that the DEA discriminated against Harris for reasons of her race or sex when it denied additional leave from the Leave Bank.

## CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date: June 12, 2002